1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney
2
    THOMAS A. COLTHURST (CABN 99493)
3   Chief, Criminal Division

4   CASEY BOOME (NYBN 5101845)
    Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       FAX: (415) 436-7234
        Email: casey.boome@usdoj.gov
8
    Attorneys for United States of America
9

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12             SAN FRANCISCO DIVISION

13

14   UNITED STATES OF AMERICA,              CASE NO. CR 21-453-SI

15          Plaintiff,                      **UNITED STATES' SENTENCING
                                            MEMORANDUM**
16      v.
                                            Date:  July 14, 2023
17   BERNARD CURRAN,                        Time: 11:00 a.m.

18                                          Hon. Susan Illston
            Defendant.
19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2   I.     INTRODUCTION ........................................................................................................1

3   II.    OFFENSE CONDUCT .............................................................................................1

4         A.    The Developer-1 Scheme ..............................................................................2

5         B.    The Rugby Donation Scheme ........................................................................3

6   III.   APPLICABLE GUIDELINES RANGE ..................................................................7

7   IV.   SENTENCING RECOMMENDATION ..................................................................7

8         A.    Legal Standard ..............................................................................................7

9         B.    Discussion .....................................................................................................8

10  V.     RESTITUTION .......................................................................................................10

11        A.    DBI's Restitution Request ..........................................................................10

12        B.    Analysis of DBI's Request ..........................................................................11

13  VI.   CONCLUSION.......................................................................................................15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

## Cases

*Hughey v. United States,*
495 U.S. 411 (1990).................................................................................................................. 11

*Kelly v. United States,*
140 S. Ct. 1565 (2020).............................................................................................................. 12

*Pasquantino v. United States,*
544 U.S. 349 (2005).................................................................................................................. 12

*United States v. Anderson,*
741 F.3d 938 (9th Cir. 2013)..................................................................................................... 11

*United States v. Bourne,*
130 F.3d 1444 (11th Cir. 1997)................................................................................................. 15

*United States v. Brock-Davis,*
504 F.3d 991 (9th Cir. 2007)..................................................................................................... 12

*United States v. Carty,*
520 F.3d 984 (9th Cir. 2008)....................................................................................................... 8

*United States v. Cummings,*
281 F.3d 1046 (9th Cir.2002).................................................................................................... 12

*United States v. De La Fuente,*
353 F.3d 766 (9th Cir.2003)...................................................................................................... 12

*United States v. Gordon,*
393 F.3d 1044 (9th Cir.2004).................................................................................................... 12

*United States v. Grice,*
319 F.3d 1174 (9th Cir.2003).................................................................................................... 12

*United States v. Hairston,*
888 F.2d 1349 (11th Cir. 1989)............................................................................................. 14-15

*United States v. Luis,*
765 F.3d 1061 (9th Cir. 2014)................................................................................................... 11

*United States v. Newman,*
144 F.3d 531 (7th Cir. 1998)..................................................................................................... 15

*United States v. Phillips,*
367 F.3d 846 (9th Cir. 2004)................................................................................................. 12-13

*United States v. Salcedo-Lopez,*
907 F.2d 97 (9th Cir. 1990)....................................................................................................... 12

GOV. SENTENCING MEMORANDUM
CR 21-453-SI

*United States v. Schurman*,
    No. 21-CR-00234-VC-1, 2022 WL 5337746 ................................................................... 11-14

*United States v. Spano*,
    411 F.Supp.2d 923 (N.D. Ill. 2006) ................................................................................... 9

## Statutes

18 U.S.C. § 666(a)(1)(B) .................................................................................................... 1, 2, 3

18 U.S.C. § 3553(a) ............................................................................................................... 7, 8

18 U.S.C. § 3663A ................................................................................................................. 11

18 U.S.C. § 3663A(h) ............................................................................................................ 14

18 U.S.C. § 3664(e) ............................................................................................................... 14

18 U.S.C. §§ 3663(a)(2) ........................................................................................................ 11

## Rules

U.S.S.G. § 4C1.1 ................................................................................................................... 7

U.S.S.G. § 6A1.3(a) ............................................................................................................... 14

GOV. SENTENCING MEMORANDUM
CR 21-453-SI

## I.    INTRODUCTION

Defendant Bernard Curran corruptly profited from his official position as a Senior Building Inspector at the San Francisco Department of Building Inspection ("DBI") by accepting illegal reward payments in connection with official acts and concealing the payments from DBI and the public.  Once his conduct was exposed, Curran attempted to cover up his wrongdoing by filing false documents with the City of San Francisco.

On July 14, 2023, Curran will appear before this Court for a sentencing hearing after his pleas of guilty to two counts of Accepting Illegal Gratuities, in violation of 18 U.S.C. § 666(a)(1)(B).  Through his pleas, Curran admitted that he violated the public's trust and abused his official position for financial gain.  Therefore, the government respectfully requests that this Court sentence the defendant to 18 months in prison, to be followed by three years of supervised release.  Such a sentence would be sufficient but not greater than necessary to reflect the seriousness of the offense and deter others from corruptly profiting from public positions of trust.  Additionally, the Court should order Curran to pay restitution to DBI to cover the cost of an audit of Curran's work initiated after DBI learned of Curran's criminal conduct.

## II.    OFFENSE CONDUCT

DBI is the regulatory agency responsible for overseeing the enforcement of building, electrical, plumbing, disability access, and housing codes for commercial and residential buildings in the City and County of San Francisco.  Criminal Complaint ¶ 9, ECF No. 1.  Curran began working as a DBI Building Inspector in 2005 and was promoted to Senior Building Inspector in approximately 2009.  Plea Agreement ¶ 2, ECF No. 51.  In his plea agreement, Curran described his official position as follows:

> . . . my duties included conducting physical inspections of buildings and construction sites in San Francisco.  The purpose of the inspections was to verify that construction or renovation work had been completed according to the approved permit and plans.  Some projects required multiple inspections, depending on the scope of work.  At the conclusion of a project assigned to me, I conducted a final inspection, which occurred after the project sponsor had completed all permitted work.  If, during the final inspection, I concluded that the permitted work had been properly completed, I would "final" the permit and, if applicable, issue a certificate of final completion and occupancy ("CFC"), which gave the sponsor the legal authority to begin using the property for its approved purpose (*e.g.*, residential, office, retail, or other use).  For projects where no CFC was required, the project sponsor still needed final inspection approval from a

DBI inspector to verify that the permitted work had been properly completed.

*Id.;* PSR ¶ 8.

Curran's position gave him significant power over the fate of costly construction and renovation projects.  He corruptly used that power to benefit himself and a non-profit organization that he supported.  The Superseding Information to which Curran pleaded guilty alleges two counts of Accepting Illegal Gratuities, in violation of 18 U.S.C. § 666(a)(1)(B).  Each count alleges a separate scheme.

### A.    The Developer-1 Scheme

Through his plea of guilty to Count 1, Curran admitted that he accepted more than $30,000 in illegal payments from a prominent San Francisco real estate developer ("Developer-1") with whom Curran had a personal friendship and whose properties Curran regularly inspected.  PSR ¶¶ 10-17. Curran received "cash payments at or near the time he conducted a final inspection and/or issued a CFC at one of Developer-1's properties" and understood that Developer-1 gave Curran the cash "in connection with and as rewards for" the inspection or CFC.  PSR ¶ 11.

In addition to cash payments, Curran received $30,000 in debt forgiveness from Developer-1. PSR ¶ 16.  Specifically in late 2016 and early 2017, Curran needed more than $250,000 in cash to pay down his existing home mortgage so that he could reduce his monthly payments by refinancing with favorable terms. Curran asked Developer-1 to loan him $260,000 and Developer-1 agreed.  PSR ¶ 12. Curran recognized that that accepting the money from Developer-1 would present a conflict of interest if Curran continued to inspect Developer-1's properties, so Curran and Developer-1 executed an elaborate concealment strategy to disguise the transaction from DBI and the public.  See PSR ¶ 13.  The concealment included routing the cash through several relatives, including Curran's mother, rather than transferring the money directly from Developer-1 to Curran.  *Id.*  Curran agreed to sign and record a false loan agreement and deed of trust purporting to establish the terms of a fictional loan between Curran and a relative of Developer-1.  *Id*.

In early 2018, about one year after Developer-1 gave Curran the $260,000, Developer-1 agreed to forgive $30,000 of the outstanding balance.  PSR ¶ 16.  In his plea agreement, Curran acknowledges

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

his understanding that Developer-1 never required him to pay back $30,000 "in part due to [their] friendship, but also in connection with and as a reward for conducting past and future inspections on Developer-1's building projects.  PSR ¶ 15.  In fact, Curran inspected several Developer-1 projects between March 2016 and November 2020.  *Id*.  Curran never paid interest to Developer-1 in connection with the loan.  Plea ¶ 2.

Despite the cash payments and debt forgiveness that Curran received from Developer-1, Curran believes that he never granted approvals or issued CFC's that were unwarranted on any of Developer-1's projects.  See PSR ¶ 17.[1]  The government's investigation, however, uncovered evidence to the contrary. For instance, on August 17, 2018, Curran issued a Temporary Certificate of Occupancy ("TCO") at a property owned by Developer-1 on the 700 Block of Harrison Street in San Francisco.  PSR ¶ 15.  Prior to Curran issuing the TCO, another DBI building inspector, "F.C.," had identified several building code violations that required remediation before a TCO could issue.  *Id.*  After identifying the areas of noncompliance at the property, F.C. left the country and Curran took over the project for DBI.  *Id.* Curran signed off on the TCO even though the violations that F.C. had identified had not been corrected. *Id.*  Notably, Curran issued the TCO at Developer-1's Harrison Street project on August 17, 2018, just months after Developer-1 forgave Curran's $30,000 debt earlier that year.  PSR ¶ 16.

### *Efforts to Obstruct the Investigation*

By early 2021, the San Francisco City Attorney's Office was investigating improper financial benefits and potential conflicts of interest, including the loan from Developer-1, related to Curran's employment at DBI.  PSR ¶ 24.  On May 21, 2021, Curran submitted a financial disclosure form to the City of San Francisco falsely certifying that the money that he had received from Developer-1 was instead a 6% interest loan from a relative of Developer-1.  *Id.*  In his plea agreement, Curran admits that he falsified the financial disclosure form to deceive investigators and conceal the fact that Developer-1 was the source of the money.  *Id.*

### B.    The Rugby Donation Scheme

Through his plea of guilty to Count 2, Curran admitted his involvement in a separate scheme in

---

[1] The elements of 18 U.S.C. § 666(a)(1)(B) do not require proof of favorable official treatment in exchange for money.

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

which co-defendant Rodrigo Santos solicited donations to Curran's favorite charitable organization, the San Francisco Golden Gate Rugby Association ("SFGGRA"), as rewards for Curran conducting inspections and/or issuing CFC's at properties owned by Santos' clients.  PSR ¶¶ 25-30.  Santos formerly served as the president of the San Francisco Building Inspection Commission, and he was a principal and co-founder of Santos & Urrutia Structural Engineers ("S&U").  Complaint ¶ 3.  The services that Santos provided to clients through S&U included permit expediting, *i.e.* assisting clients pursuing development or renovation projects to navigate the complex system of permitting and inspections required by DBI and other City agencies.  *Id.*; PSR ¶ 25.

Between May 2017 and April 2020, Santos asked certain clients to write checks to SFGGRA around the time that Curran planned to conduct a physical inspection at the donor-client's property.  PSR ¶¶ 25-30.  On several occasions, Santos sent text messages to Curran informing him that a client had made an SFGGRA donation in connection with specific projects.  PSR ¶ 26.  Santos often informed Curran about donations made by his clients while asking Curran to take some official action for the client.  *Id.*  For example, one of Santos' clients owned a property located on the 900 Block of South Van Ness Avenue.  Complaint ¶ 34.  On April 16, 2018, Santos and Curran exchanged the following text messages about the property:

> SANTOS (to CURRAN):  Can we schedule a final for [the 900 block of] South Van Ness?  Client has given me his SF GG Rugby contribution.
>
> CURRAN (to SANTOS):  Let me check it this morning
>
> SANTOS (to CURRAN):  Thank you Senior.  I am five minutes away from the site.

*Id.*  DBI's online permit tracking system showed that Curran conducted a final inspection and issued a CFC at 900 South Van Ness on April 20, 2018.  *Id.* at ¶ 35.

In his plea agreement, Curran admits that he accepted the SFGGRA donations from Santos understanding that they were offered in connection with and as rewards for official action that Curran performed for Santos' clients.  Plea ¶ 2; PSR ¶ 26.  In total, 13 Santos clients wrote checks totaling $9,600 to SFGGRA, with one client writing two checks.  Curran took at least one official action for all 13 of the donor-clients. PSR ¶ 29.

4

Curran denies that he ever "approved a permit for a Santos client that was not warranted."  PSR ¶ 29.  However, the government's investigation uncovered evidence to the contrary.

*1300 Block of Utah Street*

On December 7, 2017, Curran gave final inspection approval to a Santos client on a permit related to a commercial building located on the 1300 Block of Utah Street.  PSR ¶ 18.  The scope of work for this permit, according to DBI's permit tracking site, was to abate a 2015 Notice of Violation (NOV) by removing partition walls that had been installed without a permit and reverting the property to its last approved floor layout from 2003.  *Id.*  Since the 2003 floor layout did not include the two partition walls, the removal of both walls was required to complete the work authorized by the permit. *Id.*

The FBI obtained images of the interior of the property taken in September 2017 during an insurance appraisal.   PSR ¶ 19.  The images show the two partition walls that the owners were required to remove to resolve the NOV.  *Id.*  In August 2020, FBI Special Agents were given access to the property.  *Id.*  During this visit, Special Agents took photographs of the interior of the building and compared them to the photos taken in 2017 by the insurance company.  *Id.*  The partition walls, which should have been removed, were still intact.  *Id.*

DBI Director O'Riordan stated that inspectors are required to physically visit the site of a project to give final inspection approval.  PSR ¶ 20.  The inspector would need to review the permit and the plans associated with the permit.  *Id.*  The plans for the project on the 1300 Block of Utah Street clearly showed that two partition walls needed to be removed.  *Id.*  Director O'Riordan stated that since the partition walls had not been removed, there could be no legitimate reason that Curran should have given final approval.  *Id.*  Notably, DBI did not issue the permit for the work required to resolve the violations until December 7, 2017, the same day that Curran claimed that he inspected the property and concluded that the work had been properly completed.  *Id.*  Since property owners are not authorized to begin work until a permit is issued, it would have been nearly impossible for all work to be completed the same day that the permit was issued.  *Id.*

Before Curran inspected the property, Santos asked his client to make a donation to SFGGRA, which Santos described as "Bernie's nonprofit."  Complaint ¶ 47.  The client sent Santos a screenshot of

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

a donation confirmation indicating that the client had directed a charitable gift fund to send a $1,500 donation to the "Golden Gate Youth Rugby Foundation." *Id.* at ¶ 48.  This donation, sent as a bank transfer from the client's charitable gift fund, was never deposited into SFGGRA's account for administrative reasons.  *Id.*  Nevertheless, it was Santos' regular practice to inform Curran of client donations while asking Curran to take official action on behalf of the client.  PSR ¶ 26.  Therefore, it is likely that Santos informed Curran of the attempted donation when he received the client's donation confirmation screenshot.

### *1400 Block of Church Street*

A different Santos client obtained a permit authorizing the construction of an accessory dwelling unit (ADU) in the lower level of a multi-unit residential building located on the 1400 Block of Church Street in San Francisco.  PSR ¶¶ 21-23.  The permit required the installation of a sprinkler system for fire safety under a separate permit number.  PSR ¶ 21.  Santos and his client never obtained the sprinkler permit, but Curran nonetheless gave final approval and issued a CFC for the property despite this deficiency.  *Id.*

Text messages between Santos and Curran show that Curran knew about the requirement that a fire safety system be added under separate permit and ignored it.  *Id.*  Santos' client, the owner of the property, made a $500 donation to the SFGGRA on January 31, 2019.  *Id.*  Between February 8 and February 11, 2019, Santos and Curran had a text message conversation about the property inspection:

> CURRAN (to SANTOS): Hey Rodrigo where is the sprinkler permit that is
>
> supposed to be done in conjunction with the ADU I don't see it online.
>
> SANTOS (to CURRAN): Should I have CPB correct the issue?
>
> CURRAN (to SANTOS): Yes
>
> SANTOS (to CURRAN): I will take care of your request ASAP
>
> CURRAN (to SANTOS): I have also entered in inspection for Church Street with
>
> a pre-final stating that sprinklers have to be verified

*Id.*  According to DBI's on-line permit and complaint tracking system, no permit relating to sprinklers

6

was applied for or issued.  PSR ¶ 22.  Curran granted final inspection approval and issued a CFC at the

property on May 9, 2018.  *Id.*  Curran put a note into the DBI system when he entered his final

inspection indicating that a future permit would be applied for to add sprinklers to the ADU.  *Id.*

According to Director O'Riordan, Curran did not have the authority to approve that permit without a

permit for sprinklers having been applied for, issued, and completed.  *Id.*  Furthermore, Curran

apparently knew that the building did not have the appropriate fire safety system because he noted in a

pre-final inspection on February 11, 2019, that the property was "pending verification of sprinkler

permit signoff."  PSR ¶ 23.  Curran issued the CFC less than one month later anyway.  *Id.*

A complaint regarding this issue was opened at DBI on July 30, 2021.  PSR ¶ 22.  Pursuant to

the complaint, the San Francisco Fire Department inspected the property and confirmed that the ADU

did not have sprinklers or any fire safety systems.  *Id.*  This indicates that the ADU, which is in the same

building as four other residential units, went without fire safety systems for several years.  PSR ¶ 23.

## III.     APPLICABLE GUIDELINES RANGE

The government agrees with the Guidelines calculation set forth in the PSR, which determines

that the total offense level is 16.  PSR ¶¶ 34-46.  The defendant has no criminal history, resulting in a

criminal history score of zero and placing him in Criminal History Category I.  PSR ¶¶ 50-51.  The

applicable Guidelines range is therefore 21 to 27 months of incarceration.  PSR ¶ 82.

The government's recommendation of 18-months represents a 3-month downward variance from

the low-end of the applicable range.  One factor contributing to the government's below-Guidelines

recommendation is the amendment approved by the United States Sentencing Commission, scheduled to

take effect on November 1, 2023, which provides for a decrease of two levels from the offense level for

defendants with a criminal history score of zero and whose offense did not involve specified aggravating

factors. U.S.S.G. § 4C1.1 (effective November 1, 2023).[2]  Curran meets the requirements of § 4C1.1 and

would receive a two-level downward adjustment if sentenced after November 1, 2023.

## IV.     SENTENCING RECOMMENDATION

### A.     Legal Standard

---

[2] Text available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf (last accessed July 7, 2023).

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); see also 18 U.S.C. § 3553(a). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines. *Id.*

After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93.  Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) The need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) The need for the sentence imposed to protect the public from further crimes of the defendant; and

(5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

**B.    Discussion**

The government respectfully submits that a sentence of 18 months of imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a) and appropriately balances the aggravating and mitigating factors presented by the offense conduct and the history and characteristics of the defendant.

**1.    The nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.**

The seriousness of the defendant's conduct is beyond dispute.  By virtue of his position as a

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

Senior Building Inspector at DBI, Curran was trusted to fairly and faithfully enforce the building code to ensure that construction and renovation projects were completed in a manner consistent with all applicable safety and quality standards.  His official position not only made him responsible for ensuring that the buildings he inspected were safe for occupancy, but also gave him significant power over the fate of costly construction and renovation projects in San Francisco.  Curran used his official position to financially benefit himself and the SFGGRA.  His conduct called into question his professional integrity and the quality of his work, particularly since the government and DBI discovered evidence indicating that Curran provided favorable official treatment at properties owned by Developer-1 (700 Block of Harrison) and certain Santos donor-clients (1300 Block of Utah and 1400 Block of Church).  Because the defendant's criminal conduct called into question the integrity of his inspections, DBI initiated an audit of Curran's work to examine the extent to which improper payments may have affected Curran's work.  The DBI audit is a significant undertaking that would be unnecessary but for Curran's conduct.

### 2.    The history and characteristics of the defendant.

By all accounts, the defendant is a loving and supportive father, brother, and son.  See PSR ¶¶ 56-64.  He serves the community by volunteering in several capacities in support of youth sports programs in San Francisco.  PSR ¶ 57.  He has maintained steady employment (PSR ¶¶ 73-77) and has no criminal history (PSR ¶ 50).  These factors weigh in favor of a more lenient sentence.

### 3.    The need for the sentence imposed to afford adequate deterrence

The need for the sentence imposed by this Court to deter similar offenses by public officials is critical.

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct. . .

*United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

The government's recommended sentence represents a significant penalty for the defendant's crimes.  Such a sentence, however, would serve two important and related purposes.  First, the sentence would deter

1   other public officials from using their positions to enrich themselves.  Second, the sentence would affirm the

2   vast majority of public officials who do their jobs honorably.  Indeed, there are undoubtedly public officials

3   in San Francisco and beyond who have declined opportunities to corruptly enrich themselves through their

4   official positions.  The government urges the Court to impose a sentence that clearly communicates that

5   those honorable public servants made the right decision.

6   **V.    RESTITUTION**

7           **A.    DBI's Restitution Request**

8           DBI seeks restitution to cover the cost of a quality control audit of projects in which Curran

9   and/or Santos were directly involved.  In a victim impact statement submitted on behalf of DBI, Director

10  O'Riordan explains why DBI initiated the audit after learning of Curran's criminal conduct:

> Curran acted outside the scope of his official responsibilities in exchange
> for a financial benefit to himself or others.  Curran's illegal conduct called
> into question the integrity of his other inspections, as well as DBI's quality
> control over the permit and inspection review process.  As a result, DBI
> began conducting an Internal Quality Control Audit [] in March 2021 to
> identify violations resulting from Curran's public integrity breaches . . .
> The Audit is not a project ordinarily undertaken by DBI staff in their
> normal course of responsibilities, and was only made necessary by
> Curran's illegal acts.

16  DBI-VIS at 1.

17          Director O'Riordan also described the methodology of the audit, which identified 5,445

18  properties and separated them into three tiers:

19  • **Tier 1**: 119 properties where both Curran and Santos were involved.

20  • **Tier 2**: 158 properties where either Curran or Santos was involved and the property sits in a

21    steep slope or seismic hazard zone, indicating heightened risk for a life-safety hazard.  Tier 2

22    includes 56 Curran-related properties and 102 Santos-related peoperties.

23  • **Tier 3**: 5,168 properties outside of a slope or seismic hazard zone where either Curran or

24    Santos were involved.  Tier 3 includes 2,846 Curran-related properties and 2,320 Santos-

25    related properties.

26  See DBI-VIS at 1-2.  As of March 17, 2023, the date of Director O'Riordan's letter, the audit team had

27  spent 3,408.5 hours reviewing 1,072 properties, which equates to slightly less than 3.2 hours per

28

10

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

property.  See *Id.* at 2.  The audit team, which is comprised of DBI professional staff, has completed its review of all Tier 1 and Tier 2 properties, and some Tier 3 properties.  *Id.*  According to the statutory hourly rates codified in the San Francisco Building Code, the cost of 3,408.5 hours is $335,391.94 (approximately $98.40 per hour or $312.87 per property).[3]  *Id.*  Using the per-property cost of $312.87, the completed and projected audit cost of all properties in each tier is as follows:

- **Tier 1**: $37,231.53 (completed, 119 properties)
- **Tier 2**: $49,433.46 (completed, 158 properties)
    - Curran-related Tier 2 properties (56): $17,520.72
    - Santos-related Tier 2 properties (102): $31,912.74
- **Tier 3**: $1,616,912.16 (ongoing, 5,168 properties)
    - Curran-related Tier 3 properties (2,846): $890,428.02
    - Santos-related Tier 3 properties (2,322): $726,484.14

### B.    Analysis of DBI's Request

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires the district court to "order a defendant to make restitution to a victim of certain specified offenses," *United States v. Anderson,* 741 F.3d 938, 951 (9th Cir. 2013) (citation omitted), including "offenses against property" under Title 18.  The MVRA does not define what constitutes an "offense against property," but the Ninth Circuit has adopted a broad reading of the phrase to include all crimes that infringe a victim's property interest.  *United States v. Schurman*, No. 21-CR-00234-VC-1, 2022 WL 5337746, at *1 (N.D. Cal. Oct. 7, 2022), citing *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014).  Physical damage to property is not necessary so long as the victim suffers a pecuniary loss.  *Lewis,* 765 F.3d at 1065–66.

Restitution is authorized where a defendant's offense conduct causes an identifiable victim of the offense to suffer recoverable losses.  *Hughey v. United States,* 495 U.S. 411, 416 (1990).  The MVRA defines a "victim" as any "person directly and proximately harmed as a result of the commission of the offense for which restitution may be ordered." 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2).  Thus, the MVRA

---

[3] DBI calculated the cost of its employee compensation by reference to the statutory hourly rates codified in SF Building Code section 110A, Table 1A-D and attached to Director O'Riordan's letter.  The statute sets forth the required costs for plan review ($173.91/hour), inspection ($158.10/hour), and administration ($96.72/hour).

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

limits the scope of harms for which restitution is authorized to those that are "directly and proximately" caused by the defendant's conduct.  The Ninth Circuit has applied this standard by asking "whether the [victim's] costs were incurred as a 'direct and foreseeable result' of the defendant's wrongful conduct." *United States v. Phillips*, 367 F.3d 846, 863 (9th Cir. 2004) (quoting *United States v. Cummings*, 281 F.3d 1046, 1052 (9th Cir. (2002)).

It is well established that a government agency may be considered a victim for purposes of restitution.  *United States v. Salcedo-Lopez*, 907 F.2d 97, 99 n.2 (9th Cir. 1990) (holding in a case decided under the VWPA[4] that "when the government loses money as the direct result of an offense, it is as entitled to restitution as any other victim of an offense"); *Schurman,* No. 21-CR-00234-VC-1 at *6 (awarding restitution to DBI for the cost of salaried employees re-inspecting properties affected by the defendant's fraud scheme);  *Phillips*, 367 F.3d at 863–64 (holding in a case prosecuted under the Clean Water Act that the Environmental Protection Agency could recover site investigation costs to assess the damage caused by the defendant's conduct);  *United States v. De La Fuente*, 353 F.3d 766, 768; 774 (9th Cir. 2003) (affirming a restitution order compensating the United States Postal Service for employee work hours lost due to an anthrax hoax);  see also *Kelly v. United States*, 140 S. Ct. 1565, 1573-74 (2020) (explaining that "the cost of [city] employees' services would qualify as an economic loss to a city" in the context of a fraud scheme and noting that the loss of municipal employee services is akin to taking "cash out of the city's bank account" and "depriving the city of a 'valuable entitlement'" (citing *Pasquantino v. United States*, 544 U.S. 349, 357 (2005)).

When the government is a victim, the district court should not award restitution for costs associated with a criminal investigation.  *Phillips*, 367 F.3d at 863 (holding that there is a "dividing line between criminal investigation costs (which are not recoverable) and other investigation costs (which may be recoverable)."  In *Phillips*, the defendant violated the Clean Water Act by unlawfully polluting a navigable river under the jurisdiction of the EPA.  *Id.* at 850-51.  In considering whether the EPA could

---

[4] The Victim Witness Protection Act (VWPA) preceded the MVRA as the controlling federal restitution statute.  Ninth Circuit has held that, because of the similarities between the MVRA and its predecessor, courts may look to cases decided under the VWPA for guidance in interpreting the MVRA. *United States v. Brock-Davis*, 504 F.3d 991, 996 (9th Cir. 2007) (citing *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir.2004); *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir.2003)).

1   receive restitution for the costs of assessing the damage caused by the defendant's crimes, the Ninth

2   Circuit concluded that the EPA's site investigation costs were "likely not a routine matter in all such

3   criminal cases . . . [but were a] direct result of the *offense*, not . . . a direct result of the criminal

4   prosecution. *Id.* (citations omitted).  In such situations, the court held, "investigation costs are a . . .

5   subset of cleanup costs and recoverable to the same extent." *Id.*

6        Judge Chhabria recently applied these principals in *Schurman*.  In that case, the defendant

7   defrauded his property-owning clients by peddling fake engineering inspection reports (known as

8   "special inspection reports") falsely certifying that an engineer had reviewed components of the clients'

9   construction and renovation projects. *Schurman*, No. 21-CR-00234-VC-1 at *1.  In fact, unbeknownst

10  to Schurman's clients, no inspections ever occurred and *Schurman* falsified the reports by making up the

11  results and forging the engineers' signatures. *Id.*  Schurman's clients submitted the fake reports to DBI,

12  which relied on them in issuing final approvals and CFC's. *Id.*  DBI Director O'Riordan submitted a

13  letter to the court explaining that Schurman's fraud necessitated re-inspection of the affected properties.

14  *Id.* at ECF No. 67, Gov. Memo Re: Restitution at *1-5.  Director O'Riordan's letter also calculated

15  DBI's losses using the statutory hourly rate set forth in the San Francisco Building Code (the same

16  section of the code used to calculate DBI's losses in this case).  See *Id.*  In awarding restitution to DBI,

17  the court found that DBI's re-inspection of the affected properties was not routine nor intended to further

18  the government's criminal investigation of Schurman. *Id.* at *6.  The court held that "where an offense

19  covered by the MVRA is the direct and proximate cause of non-prosecution work that would otherwise

20  be unnecessary, restitution is both authorized and required." *Id.*

21       Taken together, the cases show that where a government entity is a victim, investigative costs

22  that are ordinarily incurred in the usual course of investigating and prosecuting crimes are not

23  recoverable under the MVRA.  On the other hand, where the government incurs non-prosecution costs

24  to investigate and remediate harm caused by the defendant's offenses, the government can and must be

25  awarded restitution.  Here DBI's losses were the direct and proximate result of Curran's criminal

26  conduct and would not have been incurred but for Curran's scheme.  Indeed, Curran's offenses involve

27  accepting significant sums of money – at least $30,000 for himself and another $9,600 on behalf of the

28

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

SFGGRA – from property owners whose buildings Curran inspected.  Curran has admitted that he accepted these payments in connection with and as rewards for performing inspections and/or issuing CFC's.  In the case of the property located on the 1400 Block of Church Street, discussed above, DBI concluded that Curran granted final inspection approval and issued a CFC even though the owner of the property – a Santos client who made an SFGGRA donation – had not installed a required fire safety system.  Faced with Curran's integrity breach, DBI was compelled to initiate the audit.

According to DBI, the purpose of the audit is to ensure that the affected properties are safe and in compliance with building codes, not to develop evidence to further the investigation or prosecution of Curran.  DBI-VIS at 2 (noting that that DBIs restitution request reflects the agency's losses "separate and apart from the legal and investigative fees that DBI has incurred for the services of the San Francisco City Attorney's Office related to the pending San Francisco Superior Court civil case against Defendant Curran and others.").

For the foregoing reasons, DBI's restitution request falls squarely within the category of compensable investigative and remediation costs.  The Court should find that DBI's losses were the direct and foreseeable result of the defendant's wrongful conduct and order restitution accordingly.

Among the 5,445 properties involved in DBI's audit, 119 are attributable to both Curran and Santos, 2,902 are attributable to Curran alone, and 2,424 are attributable to Santos alone.  With this in mind, the Court may apportion liability between Curran and Santos where appropriate, as opposed to making both defendants jointly and severally liable for the same loss. 18 U.S.C. § 3663A(h).

The plea agreement, the PSR, Director O'Riordan's letter, and the supporting documentation attached to the letter provide the Court with sufficient evidence to order restitution.  The MVRA authorizes the district court to order restitution if it finds that the government has demonstrated the amount of the loss sustained by a victim as a result of the offense by a preponderance of evidence. 18 U.S.C. § 3664(e).  The Court can rely on hearsay, including hearsay set forth in a letter from the victim, to form its restitution order.  See *Schurman,* No. 21-CR-00234-VC-1 (the district court awarded restitution to DBI relying on a letter from Director Patrick O'Riordan setting forth DBI's loss

14

calculation using the statutory hourly rates set forth in the San Francisco Building Code);  *United States v. Hairston*, 888 F.2d 1349, 1353-54 (11th Cir. 1989) (affirming a restitution award to a bank based on a letter from the bank's attorney setting forth the bank's losses where the letter was corroborated by evidence at trial and the defendant "ha[d] not shown that the information in the letter is materially false or unreliable").

Generally, hearsay may be introduced at sentencing hearings to support a claim for restitution so long as it has "sufficient indicia of reliability to support its probable accuracy."  *United States v. Newman*, 144 F.3d 531, 542 (7th Cir. 1998) (quoting U.S.S.G. § 6A1.3(a)); *United States v. Bourne*, 130 F.3d 1444, 1447 (11th Cir. 1997) (the court, in determining the appropriate amount of restitution, may consider hearsay evidence that bears "minimal indicia of reliability" so long as the defendant is given an opportunity to refute that evidence).  Because the information before the Court establishes by a preponderance of the evidence that Curran's offense caused actual economic loss to DBI, the Court should award DBI restitution.

DBI has requested $1,014,039.15 based upon the methodology detailed in its victim impact statement.  The PSR supports this calculation.  PSR ¶ 93 ("Pursuant to 18 U.S.C. § 3663A, restitution in the amount of $1,014,039.15 is due to the victim in this case.").  Another appropriate way for the Court to fashion a restitution order would be to order Curran and Santos, jointly and severally, to compensate DBI for the audit costs associated with Tier 1 properties ($37,231.53), and further order Curran individually to compensate DBI for the costs of the properties attributed to him in Tier 2 ($17,520.72) and Tier 3 ($890,428.02).  This alternative methodology would result in a total restitution order of $945,180.27 as to Curran.

## VI.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of 18 months in prison to be followed by three years of supervised release, and order

//

//

//

GOV. SENTENCING MEMORANDUM
CR 21-234-VC

1    the defendant to pay full restitution to DBI and to forfeit $30,000 in criminal proceeds.

2

3    DATED: July 7, 2023                      Respectfully Submitted,

4

5                                        ISMAIL J. RAMSEY
                                       United States Attorney

6

7                                        */s/*
                                       CASEY BOOME
                                       Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOV. SENTENCING MEMORANDUM
CR 21-234-VC