1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  CASEY BOOME (NYBN 5101845)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       FAX: (415) 436-7234
        Email: casey.boome@usdoj.gov
8
   Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NOS. CR 21-453-SI |
| Plaintiff, | |
| v. | **UNITED STATES' MEMORANDUM RE: RESTITUTION** |
| BERNARD CURRAN and RODRIGO SANTOS, | Date: November 2, 2023<br>Time: 1:30 p.m.<br>Hon. Susan Illston |
| Defendants. | |

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | LEGAL STANDARDS AND PROCEDURES | 1 |
| | A. Legal Standard for Restitution Determination | 1 |
| | B. Procedures for Restitution Hearing | 2 |
| III. | ANALYSIS OF DBI's CLAIM FOR RESTITUTION | 2 |
| | A. DBI's Request for Restitution | 2 |
| | B. Legal Analysis of DBI's Request | 4 |
| IV. | ANTICIPATED TESTIMONY OF CHRISTOPHER VERGARA | 7 |
| | A. Mr. Vergara's Role as Audit Project Manager | 7 |
| | B. Selection Criteria of Properties to be Audited | 7 |
| | C. The Audit Process and Audit Application for Recording Results | 8 |
| | D. Calculation of Past and Future Audit Costs | 9 |
| V. | CONCLUSION | 10 |

## I. INTRODUCTION

The United States submits this memorandum to address issues raised by the Court and defense counsel during a preliminary restitution hearing held on October 27, 2023. At the conclusion of the preliminary restituting hearing, the Court set the matter for a further hearing and testimony on November 2, 2023 at 1:30 p.m.

This memorandum sets forth: 1) the legal standard and procedures applicable to a contested restitution hearing; 2) the government's analysis of the claim for restitution submitted by the San Francisco Department of Building Inspection (DBI); and 3) the anticipated testimony of DBI compliance manager Christopher Vergara in support of DBI's restitution request.

## II. LEGAL STANDARDS AND PROCEDURES

### A. Legal Standard for Restitution Determination

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires the district court to "order a defendant to make restitution to a victim of certain specified offenses," *United States v. Anderson,* 741 F.3d 938, 951 (9th Cir. 2013) (citation omitted), including "offenses against property" under Title 18. The MVRA does not define what constitutes an "offense against property," but the Ninth Circuit has adopted a broad reading of the phrase to include all crimes that infringe a victim's property interest. *United States v. Schurman*, No. 21-CR-00234-VC-1, 2022 WL 5337746, at *1 (N.D. Cal. Oct. 7, 2022), citing *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014). Physical damage to property is not necessary so long as the victim suffers a pecuniary loss. *Luis,* 765 F.3d at 1065–66.

Restitution is authorized where a defendant's offense conduct causes an identifiable victim of the offense to suffer recoverable losses. *Hughey v. United States,* 495 U.S. 411, 416 (1990). The MVRA defines a "victim" as any "person directly and proximately harmed as a result of the commission of the offense for which restitution may be ordered." 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2). Thus, restitution is required under the MVRA if the harm caused to the victim is the direct and proximate result of the defendant's conduct. The Ninth Circuit has applied this standard by asking "whether the [victim's] costs were incurred as a 'direct and foreseeable result' of the defendant's wrongful conduct." *United States v. Phillips*, 367 F.3d 846, 863 (9th Cir. 2004) (quoting *United States v. Cummings*, 281 F.3d 1046, 1052

(9th Cir. (2002)).

B. <u>Procedures for Restitution Hearing</u>

If after reviewing the PSR the Court requires further information to determine whether restitution is appropriate, and if so, in what amount, "the court may require additional documentation or hear testimony." 18 U.S.C. § 3664(d)(4). "The privacy of any records filed, or testimony heard . . . shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera." *Id.* Where the parties disagree regarding the proper amount or type of restitution, the dispute "shall be resolved by the court by the preponderance of the evidence" and "the burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). In other words, restitution must be ordered where the government shows by a preponderance of the evidence that an individual or entity is a victim of the crime for which the defendants were convicted, and that the victim's losses were caused by the defendants' offense conduct. *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010). To establish the amount of loss, "the government must provide the court with enough evidence to allow the court to estimate the 'full amount of the victim's losses with some reasonable certainty.'" *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir. 2011) (*citing United States v. Doe*, 488 F.3d 1154, 1159–60 (9th Cir. 2007)).

If the Court determines that a victim is entitled to restitution, and the Court has been presented with sufficient evidence to estimate the full amount of the victim's losses with some reasonable certainty, the Court must order restitution "without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

## III. ANALYSIS OF DBI's CLAIM FOR RESTITUTION

The government previously set forth the following facts and legal arguments in its sentencing memoranda for Defendants Santos and Curran. For the Court's convenience, the government has compiled its prior restitution-related submissions here.

A. **DBI's Request for Restitution**[1]

---

[1] The government has updated the figures for DBI's past audit costs consistent with the revisions detailed in the San Francisco City Attorney's Office September 29, 2023 letter to the Court, including Appendix A to the letter.

In victim impact statements submitted on behalf of DBI, Director O'Riordan explains why DBI initiated the audit after learning of the offense conduct in this case. Regarding Santos, Director O'Riordan stated:

> In August 2020, when DBI became aware of building code violations pertaining to permits, plans, and inspections involving Santos and Curran, DBI began its investigation. Given the severe risk to public safety posed by construction projects that had not received proper inspections and/or review by DBI due to Santos' misconduct (e.g. risks to San Francisco home owners and their neighbors), there was an urgent need for DBI to conduct an audit of all properties and/or projects involving Santos.

DBI-VIS-Santos at 2.

Regarding Curran, Director O'Riordan stated:

> Curran acted outside the scope of his official responsibilities in exchange for a financial benefit to himself or others. Curran's illegal conduct called into question the integrity of his other inspections, as well as DBI's quality control over the permit and inspection review process. As a result, DBI began conducting an Internal Quality Control Audit [] in March 2021 to identify violations resulting from Curran's public integrity breaches . . . The Audit is not a project ordinarily undertaken by DBI staff in their normal course of responsibilities, and was only made necessary by Curran's illegal acts.

DBI-VIS-Curran at 1.

Director O'Riordan also described the methodology of the audit, which identified 5,445 properties and separated them into three tiers:

- **Tier 1**: 119 properties where both Santos and Curran were involved.
- **Tier 2**: 158 properties where either Santos and Curran was involved and the property sits in a steep slope or seismic hazard zone, indicating heightened risk for a life-safety hazard. Tier 2 includes 102 Santos-related properties and 56 Curran-related properties.
- **Tier 3**: 5,168 properties outside of a slope or seismic hazard zone where either Curran or Santos were involved. Tier 3 includes 2,322 Santos-related properties and 2,846 Curran-related properties.

*See* DBI-VIS-Santos at 2-3. As of July 24, 2023, the audit team had spent 4,407.25 hours reviewing 1,214 properties, which equates to approximately 3.6 hours per property. SF City Attorney Letter, September 29, 2023. The audit team, which is comprised of DBI professional staff, has completed its

review of all Tier 1 and Tier 2 properties, and some Tier 3 properties. *Id.* According to the hourly wages of the employees working on the audit, the cost of 4,407.25 hours is $432,344.39 (approximately $98.09 per hour or $356.13 per property). *Id.* Using the per-property cost of $356.13, the actual cost of the audit to date is as follows:

- **Tier 1**: $42,379.47 (completed, 119 properties)
- **Tier 2**: $56,268.54 (completed, 158 properties)
    - Santos-related Tier 2 properties (102): $36,252.26
    - Curran-related Tier 2 properties (56): $19,943.28
- **Tier 3**: $333,693.81 (937 of 5,168 properties reviewed)
    - Reviewed Santos-related Tier 3 properties (665 of 2,322): $236,826.45
    - Reviewed Curran-related Tier 3 properties (272 of 2,846): $96,867.36

*Id.* at 3. Therefore, to date, the actual audit costs attributable to Santos include $42,379.47 for Tier 1 properties (jointly and severally with Curran), plus $273,151.71 for reviewed properties in Tiers 2 and 3, resulting in a total of $315,531.18. Moving forward, DBI estimates that audit costs will decrease to approximately $312.87 per property due to more streamlined audit procedures that DBI recently implemented. DBI-VIS-Santos at 4 n. 2. Based on the number of properties remaining to audit, DBI's projected future cost for Santos-related properties is $518,425.59.

The past audit costs attributable to Curran include $42,379.47 for Tier 1 properties (jointly and severally with Santos), plus $116,810.64 for reviewed properties in Tiers 2 and 3, resulting in a total of $159,190.11. Based on the forward-looking cost of $312.87 per property, DBI's projected cost to audit the remaining Curran properties is $805,327.38.

### B. Legal Analysis of DBI's Request

It is well established that a government agency, such as DBI, may be considered a victim for purposes of restitution. *United States v. Salcedo-Lopez*, 907 F.2d 97, 99 n.2 (9th Cir. 1990) (holding in a case decided under the VWPA[2] that "when the government loses money as the direct result of an

---

[2] The Victim Witness Protection Act (VWPA) preceded the MVRA as the controlling federal restitution statute. The Ninth Circuit has held that, because of the similarities between the MVRA and its predecessor, courts may look to cases decided under the VWPA for guidance in interpreting the MVRA. *United States v. Brock-Davis*, 504 F.3d 991, 996 (9th Cir. 2007) (citing *United States v.*

4

offense, it is as entitled to restitution as any other victim of an offense"); *Schurman,* No. 21-CR-00234-VC-1 at *6 (awarding restitution to DBI for the cost of salaried employees re-inspecting properties affected by the defendant's fraud scheme); *Phillips*, 367 F.3d at 863–64 (holding in a case prosecuted under the Clean Water Act that the Environmental Protection Agency could recover site investigation costs to assess the environmental damage caused by the defendant); *United States v. De La Fuente*, 353 F.3d 766, 768; 774 (9th Cir. 2003) (affirming a restitution order compensating the United States Postal Service for employee work hours lost due to an anthrax hoax); *see also Kelly v. United States*, 140 S. Ct. 1565, 1573-74 (2020) (explaining that "the cost of [city] employees' services would qualify as an economic loss to a city" in the context of a fraud scheme and noting that the loss of municipal employee services is akin to taking "cash out of the city's bank account" and "depriving the city of a 'valuable entitlement'" (citing *Pasquantino v. United States*, 544 U.S. 349, 357 (2005)).

While it is clear that the government can receive restitution when it suffers a loss resulting from the defendant's conduct, it is equally clear that the government may not recover costs associated with a criminal investigation. *Phillips*, 367 F.3d at 863 (holding that there is a "dividing line between criminal investigation costs (which are not recoverable) and other investigation costs (which may be recoverable)"). In *Phillips*, the defendant violated the Clean Water Act by unlawfully polluting a navigable river under the jurisdiction of the EPA. *Id.* at 850-51. In considering whether the EPA could receive restitution for the costs of assessing the damage caused by the defendant's crimes, the Ninth Circuit concluded that the EPA's site investigation costs were "likely not a routine matter in all such criminal cases . . . [but were a] direct result of the *offense*, not . . . a direct result of the criminal prosecution. *Id.* (citations omitted). In such situations, the court held, "investigation costs are a . . . subset of cleanup costs and recoverable to the same extent." *Id.*

Judge Chhabria recently applied these principals in *Schurman*. In that case, the defendant defrauded his property-owning clients by peddling fake engineering inspection reports (known as "special inspection reports") falsely certifying that an engineer had reviewed components of the clients' construction and renovation projects. *Schurman*, No. 21-CR-00234-VC-1 at *1. In fact, unbeknownst

---

*Gordon*, 393 F.3d 1044, 1048 (9th Cir.2004); *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir.2003)).

5
GOV. RESTITUTION MEMORANDUM
CR 21-453-SI

to Schurman's clients, no inspections ever occurred and *Schurman* falsified the reports by making up the results and forging the engineers' signatures. *Id.* Schurman's clients submitted the fake reports to DBI, which relied on them in issuing final approvals and CFC's. *Id.* DBI Director O'Riordan submitted a letter to the court explaining that Schurman's fraud necessitated re-inspection of the affected properties. *Id.* at ECF No. 67, Gov. Memo Re: Restitution at *1-5. In awarding restitution to DBI, the court found that DBI's re-inspection of the affected properties was not routine nor intended to further the government's criminal investigation of Schurman. *Id.* at *6. The court held that "where an offense covered by the MVRA is the direct and proximate cause of non-prosecution work that would otherwise be unnecessary, restitution is both authorized and required." *Id.*

Taken together, the cases show that investigative costs that are ordinarily incurred in the usual course of investigating and prosecuting crimes are not recoverable under the MVRA. On the other hand, where the government incurs non-prosecution costs to investigate and remediate harm caused by the defendant's offenses, the government can and must be awarded restitution. Here DBI's losses were the direct and proximate result of Santos' and Curran's criminal conduct and would not have been incurred but for their illegal scheme. Indeed, Curran accepted significant sums of money – at least $30,000 for himself and another $9,600 on behalf of the SFGGRA – from property owners whose buildings Curran inspected. (Curran Plea Agreement ¶ 2.) Santos facilitated the $9,600 in donations to SFGGRA, Curran's favorite charity, "intending that those donations would influence Curran in the performance of his official duties" as a DBI Senior Building Inspector. (Santos Plea Agreement ¶ 2.) In exchange for the donations, Curran gave Santos' clients favorable treatment. (*Id.*) In the case of the property located on the 1400 Block of Church Street, discussed above, Curran granted final inspection approval and issued a CFC even though the owner of the property – a Santos client who made an SFGGRA donation – had not installed a required fire safety system. (*Id.*) Faced with this evidence, DBI was compelled to initiate the audit.

According to DBI, the purpose of the audit is to ensure that the affected properties are safe and in compliance with building codes, not to develop evidence to further the investigation or prosecution of Curran. DBI-VIS at 2 ("The Audit is not a project ordinarily undertaken by DBI staff in their normal

6

course of responsibilities and was only made necessary by the illegal acts of Santos and Curran.").

For the foregoing reasons, DBI's restitution request falls squarely within the category of compensable investigative and remediation costs. The Court should find that DBI's losses were the direct and foreseeable result of the defendants' wrongful conduct and order restitution accordingly.

## IV.  ANTICIPATED TESTIMONY OF CHRISTOPHER VERGARA

At the hearing scheduled for November 2, 2023, the government intends to offer the testimony of Christopher Vergara, who joined DBI as a compliance manager in June 2022. Among other duties and responsibilities, Mr. Vergara serves as the project manager for DBI's internal audit of Curran- and Santos-related projects. The following is a proffer of Mr. Vergara's expected testimony based on undersigned counsel's discussions with Mr. Vergara and information provided to undersigned counsel by the San Francisco City Attorney's Office. The following is not intended to summarize the totality of Mr. Vergara's testimony.

### A.  Mr. Vergara's Role as Audit Project Manager

The audit commenced in March 2021. When Mr. Vergara joined DBI in 2022, he was assigned to serve as the audit's project manager. His duties include supervising audit staff, tracking audit progress, monitoring compliance with audit procedures, and reporting audit findings to management. Mr. Vergara's understanding of the goal of the audit is to ensure that integrity breaches committed by Curran and Santos have not jeopardized the safety of buildings in San Francisco.

### B.  Selection Criteria of Properties to be Audited

Regarding the properties attributed to Curran, the audit team queried DBI records for properties for which Curran conducted "same-day" inspections. Same-day inspections are significant because they are outside the standard procedure for scheduling DBI property inspections. Under the standard procedure, a property owner requests an inspection through DBI's website or telephonically, resulting in DBI management assigning a district inspector to the project. A same-day inspection, on the other hand, occurs when a property owner or project sponsor contacts an inspector directly to request an inspection by that inspector. The inspector generally enters the results of the inspection into DBI's tracking system on the same day that the inspection occurs. Because same-day inspections generally involved a project

sponsor contacting Curran directly to request that *he* conduct an inspection, DBI concluded that same-day inspections were more likely to involve potential improper influence than projects randomly assigned to Curran through the normal assignment process. DBI's query of Curran's same day inspections, which did not include a date limitation, resulted in the identification of approximately 3,000 properties. According to DBI, a query of all Curran inspections, not just same-day inspections, would have yielded at least 10,000 additional properties.

Regarding the properties attributed to Santos, the audit team queried DBI records for any project for which Santos appeared in a permit application in any capacity related to any phase of construction or renovation. DBI's query of Santos-related properties, which did not include a date limitation, resulted in the identification of approximately 2,500 properties.

The audit team is not reviewing all permits within each property subject to the audit. The audit team has identified only the permit applications in which Curran or Santos played any role. There may be instances in which there would be a need to review other permits to provide context into the ones associated with Curran and/or Santos. However, the audit is substantially limited to the permits for which Curran and/or Santos were involved.

### C. The Audit Process and Audit Application for Recording Results

Exhibit 5 to DBI's September 29, 2023 submission to the Court contains screenshots of the audit application ("the app"), which inspectors use to facilitate review of each audit property. Mr. Vergara will explain for the Court the significance of each of the 16 questions contained in the app, and how each question relates to the goals of the audit. Once the audit inspector answers the questions contained in the app, the property is marked "reviewed" in the audit's recordkeeping system. As of July 24, 2023, approximately 1,214 properties had been marked "reviewed," or about 22% of all audit properties. Of those approximately 1,214 "reviewed" properties, 236 were flagged for additional follow up, which may include a property inspection and issuance of a Notice of Violation (NOV). Outstanding follow-up work remains to be done at most of the 236 flagged properties. The defendants are, therefore, incorrect to assert that only 25 NOV's resulted from the audit of 1,214 properties because significant follow-up work has yet to be completed. Despite the additional follow up work needed, review of these properties is

1 considered "complete" for purposes of calculating the cost of the audit. In other words, DBI is not seeking restitution for this additional follow up work.

As of today, the audit team has reviewed approximately 1,462 properties (26% of total), with 313 flagged for follow-up work. The audit team has conducted 30 property inspections and issued 25 NOV's (*i.e.* 83% of inspections have resulted in an NOV). There are approximately 57 "red flag" properties for which the audit team has determined that a physical inspection is necessary. Assuming the same rate of NOV's to inspections (83%), those 57 red flag properties would result in an additional 47 NOV's.

### D. Calculation of Past and Future Audit Costs

Mr. Vergara will use DBI Exhibits 2 and 3 to illustrate his explanation of DBI's calculation of the past and future audit costs. The government expects his testimony will be consistent with the cover letter, dated September 29, 2023, submitted along with DBI's exhibits. DBI's calculation of the audit costs as of July 24, 2023 can be summarized as follows: the audit team has spent 4,407.25 hours auditing 1,214 properties, an average of approximately 3.6 hours per property. Based on the hourly wage of each audit employee (as detailed in Exhibit 3), and the hours attributed to each employee (as detailed in Exhibit 2) the total past audit costs are $432,344.39, an average of $356.13 per property. DBI expects the future audit costs to be approximately $312.87 per property, slightly lower than past costs because less time should be required for establishing audit review processes.

When audit inspectors log their time, each hour of audit work must be assigned to a specific property. Some audit tasks, such as meeting with the audit team to review updates to the audit app, are applicable to the audit generally but not a specific address. However, because the inspector must log audit hours to a specific address, it is possible for outlier properties to contain non-property-specific hours that would be more accurately characterized as administrative time.

//
//
//
//

9
GOV. RESTITUTION MEMORANDUM
CR 21-453-SI

## V. CONCLUSION

The government respectfully submits that DBI's audit costs were the direct and foreseeable result of the offense conduct to which Curran and Santos pleaded guilty. Therefore, the Court should order restitution for the full amount of DBI's losses consistent with the MVRA.

DATED: October 31, 2023

Respectfully Submitted,

ISMAIL J. RAMSEY
United States Attorney

　/s/　
CASEY BOOME
Assistant United States Attorney